To Supervisory File

Re: Florina Altshiler

Background

The week of April 7, 2014 AST contacted me to advise me one of LAW's employees had filed a complaint against a trooper, but that the investigation into the complaint suggested the LAW employee had "lied" in making the complaint. I requested a copy of their investigation so that I could assess that claim myself and determine what action, if any, would be appropriate with the LAW employee. On April 15, 2014 the investigative report was provided to me after the accused trooper agreed that it could be shared with me.

The AST investigation began when Florina Altshiler, an Anchorage ADA, contacted an AST trainer at the March 3-5 regional SA/SAM training in Anchorage sponsored jointly by LAW and DPS. Florina filed the complaint on March 5, the last day of the training. She alleged a trooper had texted her earlier that day during the class and the texts were inappropriate sexual comments. She showed approximately 8 texts messages to the trainer on the screen of her phone and explained she just met the trooper at this training. She had not spoken with him much during the training had not known him before the training.

AST subsequently began an investigation into the trooper's conduct. The investigators met with Florina to collect more information. She again shared the text messages and stated she did not know the trooper. The trooper, Vance Pronto, subsequently met with the investigators. He explained he had sent the messages, but that he had thought they were not out of line given the text conversation he and Florina had the day before. Vance also provided phone records that revealed 100 text messages being sent from Vance's phone to Florina's phone and from Florina's phone to Vance's phone. Vance had erased the communication from his phone when Florina no longer seemed interested in a relationship, but provided his phone to the investigators so that they could forensically search it in an attempt to recover the deleted messages. Investigators went back to Florina to ask her about these inconsistencies. Florina continued to deny having sent or received any messages from Vance on the 4th, the day before her complaint. Florina provided several excuses as to why she could not provide her phone, and then ultimately refused to provide her phone to the investigators as they attempted to determine the nature of the text conversation from the 4th.

April 17, 2014

On April 17, 2014 Sharon Marshall and I met with Florina in my office. I explained I understood she had filed a complaint against a trooper and I just wanted to follow up on that. I explained the Department's interest in this matter resulted from several factors: (1) the training had been a state sponsored training, (2) it occurred

during the work day on state time, (3) the complaint was by a LAW employee against another state worker about conduct occurring during a state sponsored training on state time, (4) the complaint was not just against another state agency employee, but against an Alaska State Trooper – LAW's closest sister agency, (5) the complaint related to the potential functioning and credibility of the state criminal justice system. This last concern was influenced by the Anthony Rollins prosecution and other matters where law enforcement officers had used their position inappropriately to obtain sex. I was aware of these matters given my position as the legal advisor of the Alaska Police Standards Council.

I asked Florina to explain her concern about her communication with the trooper to me. She repeated her concerns about the inappropriate nature of the texts sent to her. These concerns and her description of what happened remained consistent with the investigative report. *See* investigators report for more details. If the information is limited to only the texts from the 5th, I shared Florina's concerns about the communication and the trooper's judgment. However, the investigation presented several questions and issues that needed to be answered and addressed. Namely, what about the texts from the fourth? I subsequently asked her if there had been any texts between her and Vance on the 4th. For the next 10-15 minutes Florina was very evasive by not making eye contact, changing the subject, and discussing the texts on the 5th. I never got a straight answer to my questions. Finally, I confronted her with the record of 100 texts found in Vance's phone records and his statements that they had been texting. Florina denied she sent those texts. She offered explanations that she had set her phone in an area away from her seat to charge it during the training. After the meeting with Florina, I spoke with Sharon and others at the training about where Florina was sitting and where she may have charged her phone. It was determined the charging location was in plain sight of the attendees and no one could have used her phone without her knowing it. During our meeting Florina suggested maybe someone else had sent the text messages. She later claimed that she did not text during lunch and that she had been at lunch with Marshall and others on the 4th. She indicated they would have known if she was texting. Vance's phone records clearly show texts being both sent and received by her phone during the lunch hour and throughout the day.

During the meeting on the 17th Florina did not understand how the texts from the day before impacted her complaint. She viewed the texts on the 4th as isolated and unrelated to any texts on the 5th without admitting she sent any texts on the 4th. I subsequently had to explain the nature of the texts Vance described (flirting) and the forensic search of Vance's phone that provided some corroboration of what he said. I explained that this information without anything else made it appear she had lied about both not having any previous communication with Vance and there not being any background that would make his texts to her less offensive. Florina expressed confusion over how anyone could reach that conclusion arguing why would she report this incident if that were true. She argued she had no reason to lie about what messages he sent her. Despite both my attempts and Sharon's attempts we could not get Florina to focus on the texts from the fourth. I inquired if she had

any other information that could help. She indicated she did not. I inquired about her phone. She gave multiple inconsistent statements about her phone: she did not have it, she sold it, she was selling it, she could not find it because it was lost in her home. Ultimately I encouraged her to allow investigators to look at phone to help them resolve this matter, but explained it was her choice. I also explained they would only provide information relevant to this matter and not simply provide all information on her phone. I also explained if no further information was available, I would have to evaluate her conduct based on the information in front of me.

Florina then stated she had been threatened. That she had received a call from an unknown number on the 6th and felt afraid. I inquired if the call was related to this matter and she indicated it was. I asked if she had reported this to the investigators. She had not. She did say she had told another employee at the Anch DAO. I advised this was a new allegation and raised substantial concerns: concerns about trooper's conduct, concerns about Florina's safety, concerns about office safety, concerns about why this was the first time she had said anything about this to a supervisor, etc.

The meeting ended with Florina being given time to talk further with AST investigators and think about whether she wanted to provide any additional information that may help explain the inconsistencies between the evidence obtained by the investigators and her story.

May 6, 2014

Sharon and I met again with Florina in my office. By this time Florina had met with AST again. She did not provide her phone. She did not provide any phone records. She refused to discuss the threats with investigators. She did not admit she texted Vance on the 4th, but also did not contest that it may have occurred. In short, she did not provide any further information to counter what Vance had said.

She argued with Sharon and I more about why she should not and would not turn over her phone. She attempted to make a comparison to being a crime victim. This comparison did not make sense because we would have obtained a search warrant for her phone if this was a criminal case and we explained this to her. She argued she was uncomfortable with her supervisors knowing about this incident. I repeated the reasons this was of concern to our Dept. Florina indicated she would not report being a victim of a crime like a rape or a DV if that happened because the department would find out. When asked how she thought such a case should be handled, she replied there should be conflict counsel like the Office of Special Prosecutions. I explained I supervised them as well, so her assertion made no sense. Sharon offered to leave, but I re-enforced why this was a matter for her direct supervisor to be aware of. I again reminded her this was about our concern she may have been untruthful and all we wanted to do was get to the truth.

Florina offered an explanation that maybe she sent the texts thinking this was an unknown person from an online dating service instead of Vance. Florina never

Exhibit G
Page 3 of 7
Case 3:16-cv-00259-SLG   Document 31-7   Filed 01/22/18   Page 3 of 7   SOA 000200

acknowledged this might mean the texts he sent her on the 5th were not as offensive as she first claimed because of the context of the previous messages. Florina could not explain how Vance was entered as a contact on her phone and she would still be confused about who sent the messages. See Miovas memo. Florina still did provide her phone or any other information to clarify of the nature of the texts from the 4th.

The meeting ended with me advising her I wanted to reflect on what she had told us before making a decision about any potential personnel action. This decision was delayed because Florina was to be in trial, and my schedule included out of town travel, three full days of case management training, and several other previously scheduled meetings.

In the following days, Florina provided me a copy of a posting of her phone on Craig's list to prove she had indeed put it up for sale. She provided me a single page of text messages to show she had been texting other people on March 4. The page she provided me was a copy of approximately 5 texts between her and a sibling of another ADA. The texts from the sibling expressed displeasure that she had shared her conversation with the sibling in the office. It struck me as a private conversation, but I did not know the real context and I did not ask.

May 22, 2014

Florina met with Sharon Marshall and me in my office. When I explained that based on the information in front of us I had concluded I could not trust Florina's judgment. She then told us she had refused to turn over her phone because it had text messages between her and another married ADA. She indicated she had an affair with this ADA and he had asked her not to turn over her phone. She indicated all she wanted to do was prosecute DV/SA cases. She indicated she wanted to do so in Alaska. I wanted to think about whether this new information affected my decision. We agreed to meet two days later.

Later that day, Florina came back to my office and requested to speak with me. She and I met in my office for approximately 10 minutes. She said she now understood what she had done wrong related to the incident with Vance and not providing all the relevant information. She understood she should have shared all the information as soon as asked. She said I and others had been trying to tell her since she started about the special position prosecutors hold in our society and the corresponding responsibilities that go with holding such a position. That message just had not sunk in until today. She just wanted another chance. Her plea appeared to be a heartfelt and sincere sentiment. I thanked her for talking with me and said I would take this into consideration.

I spoke with Sharon and Clint. I spoke with Valerie Robinson and Rick Svobodny. After these consultations I decided to give Florina another chance. There would still need to be some personnel action because the dishonesty was significant. This incident also had a potential impact on our relationship with AST. Also Florina's reasoning and approach to this incident was concerning, though she now expressed

a change of heart and claimed to understand how her behavior should have been different.

May 23, 2014

I met with Florina and Sharon in my office. I expressed that I was willing to give Florina another chance to prove herself to us, but that her conduct and this incident was serious enough that there would still need to be some consequence. Florina offered to have her salary withheld for 6 months or longer. I explained that was not an option for administrative discipline. I explained she would be placed on leave without pay for a two week period and placed on probation for 1 year for us to monitor her conduct. I also explained I did not think we could leave her in the Anchorage office. LAW had six openings around the state for ADA positions. If she really wanted to stay with LAW we would consider her for one of those positions. I explained I had met with Sharon and Clint and they were willing to supervise her in the Dillingham office. I had not spoken with any other office chiefs about her conduct (she had expressed concerns for her privacy). I explained if she wanted to be considered for another office I would need disclose her conduct in this matter to that office chief and determine if that office chief was willing to supervise her and also talk with Rick, the DAG. The options were: Bethel, Barrow, Dillingham, Palmer, Kenai, and Kodiak. Florina immediately requested Palmer and expressed reluctance to work in any other office. I talked about my employment in Dillingham and pitched why I thought that could be a good fit for her. I explained grand jury only occurred in Anch which required regular travel to Anch. I explained it was a small community with significant SA and SAM cases – the type she wanted to handle. I explained the geo differential in pay. I discussed the demographics of the community. I then told her to take the weekend to think about whether she wanted to stay with the Dept. of LAW and if so where would she be willing to go to prove herself.

May 26, 2014

Sharon was out of town for the week, so I met with Clint Campion and Florina in my office. Florina expressed she wanted to stay in the Anch office or only move to Palmer and no other options were of interest to her. We agreed to meet later that week so I could consult the Palmer Office Chief and Rick.


Prior to our next meeting Kathy Hansen from OVR called me to inquire why LAW was firing a female employee for reporting sexual harassment by an Alaska State Trooper. I expressed confusion over why OVR thought such an inquiry was within their prevue and Kathy agreed it was not really the sort of matter that was OVR's primary concern. I explained I could not get into the details of the matter because it was a personnel matter, but I assured her any action that LAW might take with any employee would be based on the employee's conduct. I further assured her the act of filing a complaint was not a basis for taking any adverse personnel action in any

case. I also explained I suspected she did not have the complete story if she thought we were taking action in response to a sexual harassment claim. Of note, this was the first time anyone had described this as sexual harassment and more importantly such a claim in no way acknowledged the previous texts that placed Vance's texts on the 5th into context.

I later learned this call from Kathy Hansen was made while Florina was in Kathy's office. Thus Kathy's word choice was known to Florina. Thus either Florina had not understood what my and Sharon's concerns had been about her conduct as she had claimed she now understood, or Florina had mischaracterized this incident to another key role player in the criminal justice system. This potential would leave that entity wondering about the Dept of LAW's actions since we could not discuss personnel matters and they would wonder why AST had not taken other action with Vance. Florina had not just repeated the very same mistake of mischaracterizing her interactions with Vance and failed to provide the complete story/picture of what transpired between her and Vance, but she compounded it by now drawing another state entity into the mix by sharing misleading information.

May 29, 2014

I met with Florina and Clint in my office. Right after they walked in and I shut my door, Florina handed me a complaint she indicated she filed with EEOP. I did not read it at that time, but turned it over and explained she was being terminated for her dishonesty and poor judgment. I advised she had until COB Monday June 2, 2014 to clean out her office. Working on June 2, 2014 would give her benefits in the month of June. I also handed her some paperwork about separation from state employment.

Of Note

This was not the first time there had been issues with Florina's judgment or failing to provide all the relevant information about a matter.

Shortly before this incident, it was brought to my attention that Florina claimed to be an Adjunct Professor of Trial Advocacy and that other ADA's suspected this was not accurate. At the time that did not seem important. When this incident was reported to me, I thought I should take a closer look at that concern. I reviewed her resume and found it indicated she was an Adjunct Professor of Trial Advocacy at St. John's School of Law. I looked at their website and could find no mention of her, so I contacted St. John's Law School and determined she was not now, nor previously ever employed as an Adjunct Professor with them. She had helped teach high school students about trial work.

She had handled a case in Anchorage where she asked for advice from both myself and Sharon separately about how to handle a charging decision, but failed to provide either of us all the relevant details. Sharon and Clint had to dismiss the charge she filed late to avoid a prosecutorial vindictiveness motion.

She flew to Bethel to assist on a SAM case and mistried it after failing to follow June's advice. June was livid and refused to allow Florina to return to Bethel to assist with any other cases.

In Oct of 2013 at the DAO annual conference in Girdwood Florina approached me to discuss some text messages she had received from her supervisor at the time. She showed me the message on her phone. I asked to look at the previous texts in the exchange. She agreed and I found evidence that both she and her supervisor had been petty and engaged in an unhealthy communication. I spoke with Florina about this and then spoke with Sharon who took corrective action with Florina's then supervisor.

Sharon spoke with several judges about Florina's performance as we were evaluating how to handle the AST situation. Sharon learned that at least one judge had a concern about Florina being honest in court related to a plea deal.

Paul Miovas expressed some concerns about Florina's honesty and candor with him about the AST incident during the course of my meetings with her. Some of this was documented in his memo, some of his concerns were expressed directly to me.

Finally, Kat Runnels was the Anch DAO employee Florina confided in about the phone call on the 6th that she described as a threat. Marshall's memo about Kat conversation is attached. Florina told Sharon and me she did not know who called her and that was why she did not report the call to her supervisor. This statement was inconsistent with Kat's memo.

Throughout this process, and upon reflection in all her time with LAW, Florina has engaged in conduct that brings her credibility and her judgment into serious question. This was the reason for terminating her employment with the Department of LAW.